IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CARL SANDLES,                    §
                                 §
        Plaintiff,               §
                                 §
v.                               §        CIVIL ACTION NO. H-05-2132
                                 §
JO ANNE B. BARNHART,             §
COMMISSIONER OF THE SOCIAL       §
SECURITY ADMINISTRATION,         §
                                 §
        Defendant.               §


<u>**MEMORANDUM OPINION**</u>

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Docket Entry No. 15) and Defendant's Cross Motion for Summary Judgment (Docket Entry No. 16). The court has considered the motions, all relevant filings, the administrative record, and the applicable law. For the reasons set forth below, Plaintiff's Motion for Summary Judgment is **DENIED** and Defendant's Cross Motion for Summary Judgment is **GRANTED**.

### I. Case Background

**A. Procedural History**

In this action, Carl Sandles ("Plaintiff") seeks review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for a

---

[1]     The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgement, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Docket Entry No. 12.

period of disability and disability insurance payments under Title II and Title XVI of the Social Security Act ("the Act"). Plaintiff protectively filed his application on April 6, 2000.[2] After Plaintiff's application was denied at the initial and reconsideration levels, he requested a hearing before an Administrative Law Judge of the Social Security Administration ("ALJ").[3]   The ALJ granted Plaintiff's request and conducted a hearing in Bellaire, Texas, on April 17, 2002.[4]   After listening to testimony presented at the hearing and reviewing the medical record, the ALJ issued an unfavorable decision on May 17, 2002.[5] The ALJ found Plaintiff was not disabled at any time during the period covered by his application, and Plaintiff appealed that decision on December 2, 2002.[6]

On January 2, 2004, the Appeals Council granted Plaintiff's request for review of the ALJ decision, vacated that decision, and remanded the case for further proceedings.[7]   In accordance with this remand, a second ALJ conducted a hearing in Houston,

---

[2]      Transcript of the Administrative Proceedings ("Tr.") 50.

[3]      Tr. 25, 34, 38.

[4]      Tr. 658.

[5]      Tr. 544.

[6]      Tr. 551, 556.

[7]      Tr. 559.

2

Texas, on June 1, 2004.[8]  It is this second hearing that gives rise to Plaintiff's present action before this court.

After listening to testimony presented at the hearing and reviewing the medical record, the second ALJ also issued an unfavorable decision, finding that Plaintiff was not disabled at any time during the period covered by his application because Plaintiff could still perform certain sedentary work involving simple repetitive tasks.[9]  On May 4, 2005, the Appeals Council denied Plaintiff's request for review of the second ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner.[10]

Plaintiff filed this timely civil action pursuant to 42 U.S.C. § 405(g) for judicial review of the Commissioner's unfavorable decision.

**B. Factual History**

**1. Plaintiff's Age, Education, and Work Experience**

Plaintiff was born on December 17, 1959, and was thirty-five years old on the date of the alleged onset of disability.[11] Plaintiff possesses a high school education, and past relevant

---

[8]     Tr. 14.

[9]     Tr. 21.

[10]    Tr. 6-8.

[11]    Tr. 47.

work experience as a driver, maintenance repairman, and computer operator.[12]

## 2. Plaintiff's Testimony

Plaintiff reported that he suffered chronic pain as a result of bladder cancer, removal of the bladder and placement of an Indiana pouch,[13] diabetes, coronary arterial disease, kidney stones, and right shoulder capsulitis.[14]  When questioned by the ALJ, Plaintiff testified that this pain caused him to be unable to concentrate, that it could only be eased by lying down, and that there was nothing he could do to stop the aching.[15]  He also stated that he was in the process of scheduling surgery to have a kidney removed, and, on average, he visited a doctor twice a month.[16]

In response to one question by the ALJ, Plaintiff said that he voided his Indiana pouch "about three, four times a day,"[17] but testified in other responses that he emptied the pouch

---

[12]     Tr. 19-20.

[13]     As the court understands from the record, this Indiana pouch is a type of continent urinary diversion in which part of the colon is used to create a way for the body to store and eliminate urine for patients who have had their urinary bladders removed.  This type of diversion required Plaintiff to use a catheter to drain urine from the pouch through an abdominal stoma.

[14]     Tr. 47, 68, 72, 86, 703.

[15]     Tr. 709, 711, 719.

[16]     Tr. 711, 715.

[17]     Tr. 709.

approximately every two hours.[18]  When Plaintiff's attorney noted that "[t]here's a little bit of difference in there in the amount that the doctor says you have to do it, and the amount you say you have to do it," Plaintiff responded "Okay."[19]  Plaintiff also stated that he had "leakage problems" from the catheter that caused him to wet his clothes approximately twice a week.[20] Plaintiff testified that he did not drive, did not hold a valid driver's license, and was concerned that it would not be safe for him to drive because of his pain.[21]  Plaintiff lived at home with his mother and fourteen-year-old daughter.[22]

### 3. Plaintiff's Medical Record

Plaintiff's medical record generally supports the testimony regarding his physical impairments and frequency of doctor visits; however, several conflicts exist regarding his reports of pain and his statements regarding the frequency and duration of his catheterizations.

Plaintiff's medical history reflects that he was diagnosed with muscle invasive transitional cell carcinoma of the bladder and an extension of the bladder tumor into the prostatic

---

[18]     Tr. 712.

[19]     Tr. 712-3.

[20]     Tr. 708.

[21]     Tr. 718.

[22]     Tr. 706.

urethra.[23]   Soon   after   first   undergoing   surgery   to   remove   the tumors   in   mid-October   1995,   Plaintiff   had   a   radical cystoprostatectomy   (removal   of   the   bladder,   prostate   gland,   and seminal   vesicles)   and   a   colonic   continent   urinary   diversion, referred   to   as   an   "Indiana   pouch."[24]   After   Plaintiff's   surgeries in   October,   he   was   discharged   in   "good"   condition   with   the   note that   "patient   has   been   completely   asymptomatic   and   free   of   any back   pain."[25]   Plaintiff   returned   to   the   hospital   on   November   13, 1995,   and   was   assessed   as   "a   patient   with   dehydration   and possible   sepsis."[26]   He   was   discharged   nine   days   later   with   only antibiotic   medication.[27]   Medical   records   indicate   that   Plaintiff returned   to   the   hospital   several   times   for   examinations   and appointments   during   the   next   two   months.[28]   The   records   do   not indicate   any   doctor   visits   from   January   8,   1996,   through   June 1997,   but   then   show   frequent   appointments   from   July   31,   1997, through   November   1997.[29]   Records   also   show   that   Plaintiff visited   the   doctor   at   least   once   in   June   1998,   once   in   December

---

[23]   Tr. 116.

[24]   Tr. 113.

[25]   Tr. 114.

[26]   Tr. 140.

[27]   Tr. 140.

[28]   Tr. 226-32.

[29]   Tr. 218, 219, 221, 222, 491, 492, 293, 498.

1998, and multiple times almost every month from 1999, through the beginning of 2002, when the first ALJ hearing took place.[30] While the medical records also indicate Plaintiff complained of pain at many of these doctor visits, Plaintiff reported on his signed medication form that he was taking "no prescribed medications" and only Benedryl and Tylenol as of April 17, 2002.[31]

### 4. Medical Expert's Testimony

Based on his review of the medical evidence, Giao N. Hoang, M.D., ("Dr. Hoang") testified at the hearing that the record revealed that Plaintiff suffered from three medical impairments: bladder cancer, impaired kidney function, and right shoulder capsulitis.[32]   Dr. Hoang testified, though, that none of these impairments met or equaled a listed impairment in the Listings.[33] Additionally, although Plaintiff's physical residual function capacity ("RFC") assessment suggested exertional limitations of lifting no more than fifty pounds occasionally and twenty-five

---

[30]     See, e.g., Tr 202, 210, 332, 383.

[31]     Tr. 650.   The court notes that Plaintiff also stated two years earlier on his Disability Report that he was taking morphine in addition to aspirin and acetaminophen.   Tr. 62.   The narcotic, though, seems to have been administered as a result of the surgery Plaintiff underwent only a few days prior to completing that form and was not regularly prescribed for Plaintiff's pain.

[32]     Tr. 722.

[33]     Tr. 721-2. "The Listings" refers to impairments listed in Appendix 1 of the Social Security Act regulations. 20 C.F.R. Pt. 404, Subpt. P, App.1.

pounds frequently, Dr. Hoang disagreed and opined that Plaintiff was more likely limited to lifting up to ten pounds frequently and twenty pounds occasionally.[34]

Dr. Hoang also stated that Plaintiff's testimony regarding the pouch voiding process was inconsistent with the medical evidence.[35]   The doctor noted that Plaintiff's medical records indicated Plaintiff should need to void only three to four times per day, and that each catheterization should take only five to fifteen minutes.[36]   Though Dr. Hoang did not explicitly rule out the truthfulness of Plaintiff's claims to need to catheterize more often than four times per day, and to take more than fifteen minutes to void the Indiana pouch, the doctor testified that the medical records lacked evidence supporting those claims.[37]   Dr. Hoang stated further that he usually assessed the degree of pain felt by a patient based on the prescriptions given by the treating doctors.[38]

### 5. Vocational Expert's Testimony

After reviewing the file and listening to the testimony, the vocational expert ("VE"), Byron Pettingill ("Mr. Pettingill"),

---

[34]    Tr. 723.

[35]    Tr. 724.

[36]    Tr. 724, 726.

[37]    Tr. 725, 726, 732, 733

[38]    Tr. 723

opined that Plaintiff's prior work as a driver was medium, semiskilled; as a maintenance repairer was medium, skilled; and as a computer operator was light, skilled.[39]   Mr. Pettingill was not asked to comment about whether Plaintiff could perform past relevant work,[40] but was presented with two hypotheticals by the ALJ to determine if other jobs in the economy were available that Plaintiff could perform.

> The first hypothetical asked Mr. Pettingill to assume that
>
> [the] individual has the same vocational profile as [Plaintiff], and is a younger individual with a high school education and past relevant work experience that [matches Plaintiff's]. And further assume that such individual has the medically determinable impairments as testified here today by Dr. Hoang, and that the medical condition is associated with a chronic pain symptomatology, and as a – also some concentration problems due to the pain symptomatology. And as a result the hypothetical individual would be relegated to no more than a sedentary level of exertion, and . . . . would be precluded from engaging in varied and complex task[s], but retained the mental capacity to engage in simple, repetitive task[s].

Based on this description, Mr. Pettingill opined that such a hypothetical individual would be capable of performing several jobs that existed in significant numbers in the national economy, including credit information clerk, order clerk, and jewelry bench hand.[41]

---

[39]   Tr. 735.

[40]   <u>See</u> Tr. 733-7.

[41]   Tr. 735-6.

Mr. Pettingill was also asked by the ALJ to consider the same hypothetical with the additional limitation of the individual also needing "more than the usual morning and afternoon breaks."[42] Mr. Pettingill testified that "any time an individual needs more than the usual scheduled breaks consistently, day in and day out[,] that it interferes with their ability to maintain employment . . . to the point where it precludes maintaining employment over an extended period of time."[43]

## II. Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner to deny disability benefits is limited to two issues: 1) whether proper legal standards were used to evaluate the evidence; and 2) whether substantial record evidence supports the decision. Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).

The widely accepted definition of "substantial evidence" is "something more than a scintilla but less than a preponderance." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000); Brown, 192 F.3d at 496. In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence,

---

[42]    Tr. 737.

[43]    Tr. 737.

decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. <u>Brown</u>, 192 F.3d at 496. The Commissioner is given the responsibility of deciding any conflicts in the evidence. <u>Id.</u> "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405 (g). Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making the court's review meaningless. <u>Brown</u>, 192 F.3d at 496.

The legal standard for determining disability under the Act is whether the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has

11

> a "severe impairment;" (3) a claimant whose impairment
> meets or is equivalent to an impairment listed in [20
> C.F.R. Pt. 404, Subpt. P, App. 1] will be considered
> disabled without the need to consider vocational
> factors; (4) a claimant who is capable of performing
> work that he has done in the past must be found "not
> disabled;" and (5) if the claimant is unable to perform
> his previous work as a result of his impairment, then
> factors such as his age, education, past work
> experience, and residual functional capacity must be
> considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994).

To be entitled to benefits, a claimant bears the burden of proving he is disabled within the meaning of the Act. Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). By judicial practice, this translates into the claimant bearing the burden of proof on the first four of the above steps and the Commissioner bearing it on the fifth. Brown, 192 F.3d at 498; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). The analysis stops at any point in the five-step process upon a finding that the claimant is or is not disabled. Greenspan, 38 F.3d at 236.

In certain cases, an ALJ may use the medical-vocational guidelines (the "Grid")[44] to determine whether a claimant is capable of performing other work. Watson v. Barnhart, 288 F.3d 212, 216 (5th Cir. 2002). The Grid is applicable if the "claimant suffers only from exertional impairments, or . . . the claimant's nonexertional impairments do not significantly affect his

---

[44]    20 C.F.R. Pt. 404, Subpt. P, App. 2.

residual functional capacity." <u>Id.</u> (quoting <u>Crowley v. Apfel</u>, 197 F.3d 194, 199 (5th Cir. 1999)). In cases where nonexertional factors can limit the range of jobs a claimant can perform, "the ALJ must rely on expert vocational testimony to establish that jobs exist." <u>Scott v. Shalala</u>, 30 F.3d 33, 35 (5th Cir. 1994).

### III. Analysis

In this case, the ALJ found that Plaintiff met the special earnings requirements of the Act and had not engaged in substantial gainful work since the alleged onset date of disability.[45] The ALJ found that Plaintiff had a history of bladder cancer and right shoulder capsulitis, but these impairments were not severe enough to meet or equal any of the Listings.[46] According to the ALJ, Plaintiff retained a RFC to perform sedentary work involving simple repetitive tasks.[47] The ALJ also found that Plaintiff's "testimony was not fully credible or consistent with the record considered as a whole."[48] Although the ALJ found that Plaintiff was not able to perform his past relevant work, the ALJ found that jobs existed in the national economy that Plaintiff could perform consistent with his RFC.[49]

---

[45]   Tr. 20.

[46]   Tr. 20.

[47]   Tr. 21.

[48]   Tr. 20.

[49]   Tr. 21.

13

The ALJ concluded that Plaintiff had not been under disability as defined by the Act at any time through the date of the decision.[50]

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits. Plaintiff contends that the ALJ's decision is not supported by substantial evidence and that the ALJ did not follow proper legal procedures.

In his motion for summary judgment, Plaintiff sets forth several arguments specifying why the ALJ committed reversible error in the decision. Plaintiff contends, based on his claims of pain, capsulitis-related impairments, need for unscheduled breaks, and need for frequent doctor visits, that the ALJ both failed to properly assess Plaintiff's RFC and failed to meet her burden of proof regarding Plaintiff's ability to perform other jobs existing in significant numbers.[51] Defendant, on the other hand, contends that the ALJ employed proper legal standards in reviewing the evidence and that the ALJ's decision is supported by substantial evidence of record.[52] Defendant therefore maintains that the ALJ's decision should stand.[53] The court will

---

[50]     Tr. 21.

[51]     Plaintiff's Motion for Summary Judgment, Docket Entry No. 15.

[52]     Defendant's Cross Motion for Summary Judgment, Docket Entry No. 16.

[53]     Defendant's Cross Motion for Summary Judgment, Docket Entry No. 16.

consider these arguments.

**A. Pain**

Plaintiff first contends that the ALJ erred by failing to properly assess Plaintiff's RFC in light of Plaintiff's claim of constant pain.  The court disagrees.

While pain can constitute a disabling impairment, and the ALJ is required to consider subjective evidence of pain along with other record evidence, the ALJ is ultimately responsible for making the determination of whether the pain is debilitating. See Cook v. Heckler, 750 F.2d 391, 395 (5th Cir. 1985). Wren, 925 F.2d at 128.  "While an ALJ must consider an applicant's subjective complaints of pain, he is permitted to examine objective medical evidence in testing the applicant's credibility.  He may find, from the medical evidence, that an applicant's complaints of pain are not to be credited or are exaggerated." Johnson v. Heckler, 767 F.2d 180, 182 (5th Cir. 1985).

The ALJ's decision noted that Plaintiff alleged experiencing pain, but also referenced Plaintiff's April 2002 form stating that he took no prescribed medications, an admission inconsistent with his claim of constant pain.  Additionally, the ALJ noted that although Plaintiff "stated at the initial hearing that he took no medications because they did not help, there are no

15

treating notes indicating that [Plaintiff] voiced this concern to his doctor so that other medications could be tried."[54]   The ALJ indicated that she considered Plaintiff's complaints of pain and, based on medical evidence in the record and testimony by the medical expert, determined that Plaintiff's complaints of pain were not fully credible.[55]

The Commissioner is given the responsibility of deciding any conflicts in the evidence, and "the ALJ's findings regarding the debilitating effect of the subjective complaints are entitled to considerable judicial deference." Brown, 192 F.3d at 496.   James v. Bowen, 793 F.2d 702, 706 (5th Cir. 1986).   Because the ALJ's determination of the severity of Plaintiff's complaints of pain was supported by substantial evidence, the court finds that the ALJ did not fail to properly assess Plaintiff's RFC.

**B. Capsulitis**

Next, Plaintiff states that his post-traumatic adhesive capsulitis precludes him from being able to perform any type of sedentary work, and argues that "no meaningful analysis or discussion is present in the ALJ's decision regarding Plaintiff's limitations associated with his post-traumatic adhesive capsulitis."[56]   The court again disagrees.

---

[54]   Tr. 14.

[55]   Tr. 18, 20.

[56]   Plaintiff's Motion for Summary Judgment, Docket Entry No. 15, p. 9.

The ALJ's decision recognized Plaintiff's diagnosis of post-traumatic adhesive capsulitis, but noted that "[t]here is no evidence that the claimant is unable to perform fine and gross movements effectively...", and that "[t]he doctor at the Urology Clinic at Ben Taub Hospital was asked to describe limitations (such as limitations using the hands, arms, fingers and other specific limitations), and he responded 'None noted in chart.'"[57]

As the Third Circuit has noted, "the ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." Cotter v. Harris, 650 F.2d 481, 482 (3d Cir. 1981). In the current case, the ALJ considered Plaintiff's complaints of capsulitis-related impairments and, based on medical evidence in the record and testimony by both Plaintiff and Dr. Hoang, determined that those complaints did not preclude him from performing sedentary work.[58]  The Commissioner is given the responsibility of deciding any conflicts in the evidence, and the ALJ's determination, here, was supported by substantial evidence. Brown, 192 F.3d at 496.  Therefore, the court finds that the ALJ did not fail to properly assess Plaintiff's RFC in light of Plaintiff's claimed limitations associated with his post-

---

[57]    Tr. 16, 19.

[58]    Tr. 18, 20.

traumatic adhesive capsulitis.

**C. Unscheduled Breaks**

Plaintiff argues in his Motion for Summary Judgment that he must empty his Indiana pouch every two hours, and must spend up to thirty-five minutes doing so each time.  He claims that the ALJ erred in rejecting his testimony on this subject, specifically by "not showing good cause as to why she rejected the opinions of Plaintiff's treating physicians."[59] He further contends that a finding that this testimony was credible would require Plaintiff be found to be disabled.

The court finds that the ALJ did not commit a legal error in rejecting the testimony regarding unscheduled breaks for catheterization, and that the ALJ's determination was based on substantial evidence.

First, the court finds no support for Plaintiff's claim that the ALJ completely rejected the opinions of Plaintiff's treating physicians.  On the contrary, the ALJ noted that reports from Plaintiff's treating physicians are inconsistent (i.e., "It was the opinion of the doctor, whose signature is illegible, that the claimant needed to take unscheduled restroom breaks every four hours to empty his Indiana pouch during an eight hour work day . . . . The notes from Ben Taub Urology Clinic do not indicate that

---

[59]     Plaintiff's Motion for Summary Judgment, Docket Entry No. 15, p. 11.

the claimant needed to take unscheduled breaks . . . ."[60]).  The
ALJ further noted that "there are no medical records supporting"
Plaintiff's claims to need more than the usual morning and
afternoon breaks, and that "the report by the doctor at the
Urology clinic at Ben Taub Hospital reflects that the use of the
catheter did not prevent [Plaintiff] from working."[61]  The ALJ's
decision considered all of the opinions from Plaintiff's treating
doctors, and was based on substantial evidence.

**D. Frequent Doctor Visits**

Plaintiff last contends that the ALJ erred by determining
that Plaintiff could perform work that existed in significant
numbers in the national economy.  He claims that the ALJ failed
to adequately consider Plaintiff's frequent doctor visits and the
result those potential absences would have on his ability to
perform substantial gainful activity.

At issue here is whether the ALJ carried her burden on step
five of the disability determination process.  In order to
determine that Plaintiff could perform work that existed in
significant numbers, the ALJ called a VE to testify based on
hypothetical questions that incorporated Plaintiff's disabilities

---

[60]    Tr. 17.

[61]    Tr. 19.  The court recognizes that a doctor did note on Plaintiff's
Bladder Problem Residual Functional Capacity Questionnaire that Plaintiff may
need to take unscheduled restroom breaks "[e]very 4 hrs." during an eight-hour
working day, but does not find that to contradict the ALJ's statement. Tr. 653.

and limitations recognized by the ALJ.  The ALJ presented the VE with two hypotheticals, neither of which referenced Plaintiff's need for frequent doctor visits.[62]  The record reflects, though, that Plaintiff never gave the ALJ a reason even to consider that those visits may be considered a limitation.

First, no evidence in the record suggests that Plaintiff's doctor visits would constitute any limitation on his ability to work.  In response to two questions from his attorney in the hearing, Plaintiff stated that he visited the doctor "twice a month" on average; however, when asked by the ALJ to explain what would preclude him from working, Plaintiff never mentioned being limited as a result of doctor visits.  When Plaintiff was given an opportunity in the hearing by his attorney to elaborate on "why [Plaintiff] couldn't do what we would call a sit down desk job or a sedentary type job," Plaintiff similarly failed to raise doctor visits as a limitation.  Finally, when the ALJ finished questioning the VE, Plaintiff's attorney had an opportunity to offer any corrections or additional limitations to the hypotheticals considered and offered none.[63]

Plaintiff's statement in his Motion for Summary Judgment that he "would presently need twenty-four days off from his

---

[62]     Tr. 735-7.

[63]     Tr. 737 (Plaintiff's attorney stated "I have no questions, Your Honor" when the ALJ passed the VE).

20

employer per year to be examined by physicians" is a completely
unsubstantiated argument of counsel.[64]   No evidence exists in the
record to support counsel's assumption that each doctor visit
would require Plaintiff to miss an entire day of work; nor does
any evidence exist to even suggest that the ALJ should have
considered frequent doctor visits to be a limitation.   Similarly,
no evidence exists before this court to demonstrate that the
ALJ's finding was unsubstantiated.

Based on the above, the court finds that the ALJ did not err
in determining that Plaintiff could perform work that existed in
significant numbers in the national economy.

**C. Defendant's Motion for Summary Judgment**

Defendant asserts in her motion that the ALJ's decision
should be affirmed because it properly determined Plaintiff was
never under a disability.[65]   Finding no legal error in the ALJ's
decision, the court should not disturb it if substantial record
evidence supports the ALJ's finding that Plaintiff is not
disabled.

The court recognizes the seriousness of Plaintiff's medical
condition; however, the court must review the record with an eye

---

[64]   Plaintiff's Motion for Summary Judgment, Docket Entry No. 15, p.
14.

[65]   Defendant's Cross Motion for Summary Judgment, Docket Entry No.
16, p. 13.

toward determining only whether the ALJ's decision is supported by more than a scintilla of evidence. <u>See</u> <u>Carey</u>, 230 F.3d at 135. The court finds more than a scintilla of evidence in support of the ALJ's decision. Therefore, the court cannot overturn the decision of the ALJ, who is given the task of weighing the evidence and deciding disputes. <u>See</u> <u>Chambliss v. Massanari</u>, 269 F.3d 520, 522 (5th Cir. 2001); <u>Carrier v. Sullivan</u>, 944 F.2d 243, 247 (5th Cir. 1991).

The court also agrees with Defendant that the ALJ applied proper legal standards in evaluating the evidence and in making her determination. Therefore, Defendant's Motion for Summary Judgment will be granted.

### IV. Conclusion

For all of the foregoing reasons, the court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendant's Cross Motion for Summary Judgment.

SIGNED at Houston, Texas, this 21st day of April, 2006.

Nancy K. Johnson
United States Magistrate Judge